In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 14-1363, 14-1364, 14-1426 & 14-2689

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JERRY BROWN, *et al.*,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Central District of Illinois.
No. 12-cr-40031 — **Sara Darrow**, *Judge.*

ARGUED NOVEMBER 9, 2015 — DECIDED MAY 13, 2016

Before WOOD, *Chief Judge*, ROVNER, *Circuit Judge*, and SHAH, *District Judge*.[*]

WOOD, *Chief Judge*. This case involves a conspiracy to distribute crack cocaine in Kewanee, Illinois, and surrounding areas. Spotting the opportunity for profit, Chicago drug dealer Frederick Coleman and a colleague began to focus on

---

[*] Of the Northern District of Illinois, sitting by designation.

Kewanee in late 2008. Eventually, Jerry Brown, Darrion Capers, Nicholas Clark, Qubid Coleman, and James Tatum (among others) joined their operation. The police eventually caught up with them, and in 2012 they were charged by a grand jury with conspiracy to distribute and possess with intent to distribute at least 280 grams of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846. Qubid Coleman and Tatum pleaded guilty and are not part of this appeal. Frederick Coleman, Brown, Capers, and Clark were convicted after a jury trial and sentenced to varying terms of imprisonment and supervised release. These four have appealed. Before this court, they raise challenges to both their convictions and their sentences. Finding no reversible error, we affirm the judgments of the district court.

## I

Throughout the twelve-day trial, the government presented evidence that Frederick Coleman and his colleague, Dorian Thompson, had been selling drugs in Chicago for some time. (From this point, our references to "Coleman" mean Frederick unless we specify otherwise.) In 2008, they realized that there were untapped profit opportunities in Kewanee. They tested the potential new market by jointly purchasing some powder cocaine, cooking it into crack, and selling it there. Pleased with the results, they invited Nicholas Clark to join shortly thereafter; Clark acted as the Kewanee operation's first "runner," helping to deliver the drugs to customers and collect money. Coleman ended his alliance with Thompson in early 2009, when he entered into a partnership with Brown. Participating runners included Clark, Capers, Tatum, Qubid Coleman, and others.

The government's theory was that Coleman and Brown obtained the cocaine in Chicago, cooked it into crack with the help of the runners at different locations in Kewanee and Chicago, and had various members of the conspiracy transport either the powder or the crack from Chicago to Kewanee. Members of the conspiracy sometimes elicited assistance from customers and sometimes compensated those customers with crack. The conspiracy's members used Western Union and MoneyGram to circulate money among sellers, purchasers, and wholesalers, often handing cash to family members, friends, or customers and directing that they conduct a transfer.

Kewanee law enforcement officers became aware of the operation and conducted eight controlled buys with four of the conspiracy's customers. At trial, the government backed up the controlled-buy testimony with audio and video recordings of the exchanges and call logs from the three cell phones the conspiracy's members used for drug sales. The government also presented evidence of the Western Union and MoneyGram transactions, along with testimony by some of the people involved in the transactions; jail calls between arrested members of the conspiracy and members not yet arrested; evidence of drugs and drug money; and extensive testimony by members of the conspiracy, eleven customers, and various other involved witnesses. After the jury convicted, the court sentenced the four defendants as follows: Coleman and Brown received mandatory life sentences, to be "followed" by ten years of supervised release; Capers was sentenced to 188 months' imprisonment and five years' supervised release; and Clark received a 120-month sentence, followed by ten years of supervised release.

**II**

**A**

The defendants raise a number of challenges to the district court's handling of the evidence at trial. We review these rulings for abuse of discretion. *United States v. Briscoe*, 896 F.2d 1476, 1490 (7th Cir. 1990) ("appellants carry a heavy burden in challenging the trial court's evidentiary rulings on appeal because a reviewing court gives special deference to the evidentiary rulings of the trial court." *Id.* at 1489–90 (internal quotation marks omitted)). They also assert that the cumulative errors were so serious that they did not receive the due process that is guaranteed by the Constitution; we review this *de novo*. Finally, Coleman, Brown, and Capers challenge various aspects of their sentences; we review these arguments using a mixed standard of review.

1

Before trial, the defendants learned that the government intended to use the MoneyGram and Western Union records in its case-in-chief. They filed a motion *in limine* to prevent this, but they were unsuccessful, and so they objected again at trial. The government had obtained through subpoenas the records of the two companies showing wire transfer transactions between the defendants and others allegedly involved in the conspiracy. The lead investigator in the case, Inspector Nicholas Welgat, created summary exhibits from the subpoenaed records. The summaries grouped transactions by sender and listed the amount of money sent, the date of the transaction, the sender's name and address, the recipient's name, and the agency from which the funds were sent. The exhibits included the sender's phone number and recipient's address for

some transactions. The government witnesses testified that the summary exhibits were generally consistent with their recollections of the drug transactions in which they had engaged with the defendants, and the government later moved to admit the actual exhibits through Inspector Welgat.

The court admitted the exhibits as summaries of records of regularly conducted activity, colloquially known as "business records." Federal Rule of Evidence 1006 authorizes a proponent of evidence to use a "summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court," provided that the proponent makes the content available to the other party. Federal Rule of Evidence 803(6) allows admission of hearsay documents that record a "regularly conducted activity" where (A) the records are made "at or near the time" of the activity "by—or from information transmitted by—someone with knowledge;" (B) the records are "kept in the course of a regularly conducted activity of a business, organization, occupation, or calling;" (C) "making the record [i]s a regular practice of that activity;" (D) "all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification;" and (E) "neither the source of the information nor the method or circumstances of preparation indicate a lack of trustworthiness." Federal Rule of Evidence 902(11) identifies "certified domestic records of a regularly conducted activity" as "self-authenticating" where the custodian or other qualified person does the certifying in compliance with a federal statute or Supreme Court rule.

The defendants maintain that the involvement of a third party in creating the MoneyGram and Western Union rec-

ords—namely, the customer making the wire transfer—removes those records from the ambit of Rule 803(6). But third-party involvement is not inevitably fatal. In *United States v. Emenogha*, 1 F.3d 473, 484 (7th Cir. 1993), we found that "additional sources of corroboration" can "cure the hearsay problem" that a third party's involvement in creating a business record introduces. There, the defendant argued that bank records of drug-money transactions purportedly conducted by him were inadmissible because an imposter might have been impersonating him at the bank.

We found his argument unavailing because the bank president testified that he recognized the defendant as a customer, and the bank's regular practice was to request an identification and account number before completing a transaction. *Id.* We contrasted the situation in *Johnson v. Lutz*, 170 N.E. 517 (N.Y. 1930), a New York case in which the state court found a police report inadmissible as a business record because it included information provided by a bystander, rather than facts personally known by the officer making the record. It was critical for admissibility in *Emenogha* that the bank required an ID and had a witness who could confirm the identity. 1 F.3d at 484 (comparing *United States v. Lieberman*, 637 F.2d 95, 100 (2nd Cir. 1980), where the Second Circuit denied admission of a hotel guest card, part of which was filled out by the guest, because it was not the hotel's practice to request identification; with *United States v. Zapata*, 871 F.2d 616, 625–26 (7th Cir. 1989) (abrogated on other grounds) (registration card admissible because the hotel's practice was to verify identification and witnesses testified that they met the person at the hotel).

The First and Tenth Circuits have directly addressed Western Union records. The Tenth Circuit found Western Union

records inadmissible to prove the identity of the senders of money, because no identification was required to send money, but the records could be used to prove the identity of recipients because identification was required to receive the money. *United States v. McIntyre*, 997 F.2d 687, 701–02 (10th Cir. 1993). The First Circuit similarly concluded that Western Union records provided by the company could not be admitted to prove the identity and address of the sender. *United States v. Vigneau*, 187 F.3d 70, 77 (1st Cir. 1999).

Taking all this into account, we find no abuse of discretion in the district court's decision to admit the Western Union and MoneyGram records here. We agree with the defendants that certification alone would not be enough: a Rule 902(11) certification cannot overcome Rule 803(6)'s requirement that the records must be trustworthy. And a government witness testified that Western Union and MoneyGram did not require identification for transfers of less than $1,000, meaning that one of the forms of corroboration used in *Emenogha* and *Zapata* was not present for at least some of the transactions. But the record contains more than certifications: we have the testimony of the witnesses about their recollections of actually conducting the transactions, and that testimony fills any gap left by the certifications.

We grant that the records and the testimony were not fully consistent: some witnesses testified that the summaries included some transactions that they recalled conducting and some that they did not. But we need not conduct a case-by-case inquiry into each transaction. Any inconsistencies go to the weight of the evidence, not its admissibility. See *United States v. Keplinger*, 776 F.2d 678, 693 (7th Cir. 1985) ("The determinations whether a proper foundation has been laid for

application of the business records exception to a particular document and whether the circumstances of the document's preparation indicate untrustworthiness are within the discretion of the trial court."); *United States v. Towns*, 718 F.3d 404, 410 (5th Cir. 2013) (finding no abuse of discretion in admission of pharmacy drug purchase records, noting that a driver's license was required for the purchases and a signature was obtained for many of them, and "Towns was free to make arguments at trial that he was not the actual purchaser of the drugs, but accuracy does not control admissibility."). The government's use here of summary charts that were not fully corroborated by their witnesses may have been sloppy, but the evidence was reliable enough to reach the jury. Any further discounting was for the jury to make.

2

We add that even if the district court's admission of the summary exhibits was error, that error was harmless. See FED. R. CRIM. P. 52(a). Improper admission of evidence is harmless where the remaining evidence of guilt is overwhelming. *United States v. Hanson*, 994 F.2d 403, 407 (7th Cir. 1993). Harm results only when there is a "substantial and injurious effect or influence on the jury's verdict." *Id*. (internal quotations marks omitted).

The defendants paint the MoneyGram and Western Union records as the "lynchpin" of the government's case and thus, if admitted improperly, harmful. But the evidence of their guilt was overwhelming. It included testimony from more than a dozen witnesses who purchased crack cocaine or worked with the defendants and knew the day-to-day operations of the conspiracy, eight controlled buys monitored by law enforcement, and phone records and recorded jail calls in

which members of the conspiracy plotted to cover up and maintain the conspiracy after their arrest. This is more than enough to render any error with regard to the summaries harmless.

## B

Defendants raise a separate Confrontation Clause objection to the district court's admission of testimony about the Western Union and MoneyGram records. Because this claim was not raised at trial, we review it only for plain error. See FED. R. CRIM. P. 52(b). Reversal is appropriate only if there was a "clear or obvious error that affected the outcome of the trial." *United States v. Dumeisi*, 424 F.3d 566, 576 (7th Cir. 2005). Because the records in question were nontestimonial, there was no error of this type, let alone plain error.

The Confrontation Clause applies only to testimonial evidence. U.S. Const. amend. VI; *Crawford v. Washington*, 541 U.S. 36, 68 (2004) ("Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."). Testimonial statements are formal statements to government officers, or formalized testimonial materials such as affidavits, depositions, and the like, that are destined to be used in judicial proceedings. See *Crawford,* 541 U.S. at 51–52; see also *Bullcoming v. New Mexico*, 564 U.S. 647 (2011) (blood-alcohol report testimonial); *Michigan v. Bryant*, 562 U.S. 344 (2011) (statements to police during ongoing emergency not testimonial); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309–10 (2009) (certificates from laboratory analysts identifying a narcotic substance testimonial); *Davis v. Washington*, 547 U.S. 813, 829–30 (2006) (statements made to 911 operator not testimonial).

Business records are generally nontestimonial. *Crawford*, 541 U.S. at 56. Logically, if they are made in the ordinary course of business, then they are not made for the purpose of later prosecution. *Id.* In *United States v. Ellis*, 460 F.3d 920, 926, 927 (7th Cir. 2006), we held that hospital blood and urine test records were admissible as business records because they were made "in the ordinary course of business," were "routine," and were "too far removed from the principal evil at which the Confrontation Clause was directed to be considered testimonial." *Id.* (internal quotation marks omitted). The same can be said about the Western Union and MoneyGram records. They were routine and prepared in the ordinary course of business, not in anticipation of prosecution. The records were therefore nontestimonial, and the defendants were not entitled under the Sixth Amendment to confront the persons who created them.

## C

The defendants also raised claims under *Brady v. Maryland*, 373 U.S. 83 (1963), in their motion for a new trial under Federal Rule of Criminal Procedure 33—a motion that the district court denied. We review this ruling for abuse of discretion. *United States v. Stallworth*, 656 F.3d 721, 731 (7th Cir. 2011). To prevail, defendants need to show "(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defendant; and (3) that it [was] material to an issue at trial." *Id*. Material evidence is that which creates a "reasonable probability that, had [it] been disclosed to the defense, the result of the proceeding would have been different." *Id.* Even when evidence material to the credibility of government witnesses is made available as late as during trial, there is still no *Brady* violation as long as the defense has "an appropriate

opportunity to incorporate that information into their cross-examination … ." *United States v. Knight*, 342 F.3d 697, 706 (7th Cir. 2003). Defendants allege several *Brady* violations: the suppression of information related to witness John Hart, the failure to inform the defense that government witness Ed Kolata had suffered a brain injury, and the suppression of information about inconsistent grand jury testimony by witnesses Heather Murphey and Jennifer Ince.

After being found with crack paraphernalia, Hart agreed to become a confidential source for the government. As a result of his cooperation, he was not charged. Defendants were notified of this fact in a September 29, 2012, letter; Hart testified at trial on May 20, 2013. There he denied that he had been arrested and that he had received any benefit in exchange for being a confidential informant. The district court decided that he had not perjured himself. Defendants argue that the government violated *Brady* by misleading defense counsel about who would be the best witness to impeach Hart. But the defendants knew that Hart had lied, and the prosecution has no obligation to assist the defense in crafting a trial strategy. Because the government did not suppress information about Hart's arrest, there was no *Brady* violation.

Neither did the government suppress information about Kolata's brain injury: it was not aware of the injury until Kolata's questioning on cross-examination. The defendants have pointed to no evidence that would suggest that the government became aware of the injury any earlier than the defense did. Additionally, defense counsel was able to cross-examine Kolata fully about the details of his injury.

The defendants next allege that the government suppressed the fact that Murphey and Ince lied to the grand jury

about when and how often they purchased crack from the de-
fendants. The defendants point to testimony during Welgat's
cross-examination that reveals that he was aware of what the
two witnesses had said to the grand jury. There is no evidence,
however, indicating that Welgat knew that the women in-
tended to tell a different story at trial. Without that, there is
no suppression and no *Brady* violation. Once again, the de-
fendants were able to explore these witnesses' inconsistencies
on cross-examination.

The defendants raise one last perplexing *Brady* theory: that
the government failed to disclose statements by defendants
that it intended to use at trial involving threats to witnesses.
But *Brady* material must be exculpatory. See *United States v.
Grintjes*, 237 F.3d 876, 880 (7th Cir. 2001). These statements are
about as far from exculpatory as one can imagine. They are
not covered by *Brady*.

D

Cumulative trial error that is so serious that the proceed-
ing violated the defendant's due process rights can be demon-
strated by (1) identifying at least two errors committed during
trial and (2) establishing that the errors considered together,
along with the record, so infected the jury's deliberation that
they denied the appellants a fundamentally fair trial. *United
States v. Avila*, 557 F.3d 809, 821–22 (7th Cir. 2009). Even if this
standard is met, reversal is not warranted if the error was
harmless "beyond a reasonable doubt." *Chapman v. California*,
386 U.S. 18, 24 (1967). Because the defendants have demon-
strated at most one colorable trial error—improper admission
of summary exhibits of MoneyGram and Western Union
transfer records—we have no "cumulative" error to consider.
Furthermore, the evidence of guilt was strong enough that

even if the defendants were correct about all their alleged errors, they cannot prevail: any error was harmless beyond a reasonable doubt.

## III

We now turn to Brown, Coleman, and Capers's challenges to their sentences. We review the district court's determination of facts at sentencing for clear error, and its interpretation of the guidelines and other statutory enhancements *de novo*. *United States v. Hinds*, 770 F.3d 658, 662 (7th Cir. 2014); *United States v. Reeves*, 695 F.3d 637, 639 (7th Cir. 2012).

### A

Brown and Coleman argue that their sentences—mandatory life terms because of prior drug felonies pursuant to 21 U.S.C. § 841—are improper because a jury did not find the existence of their prior felonies. This argument is foreclosed by *Almendarez-Torres v. United States*, 523 U.S. 224 (1998) (rejecting petitioner's claim that commission of a prior crime is an element of the offense that a jury must find beyond a reasonable doubt.). *Almendarez-Torres* remains good law after *Alleyne v. United States*, 133 S. Ct. 2151 (2013) (holding that all facts that increase a mandatory minimum sentence must be found by jury), and so we are bound to follow it.

### B

Capers was sentenced to 188 months, based on an offense level of 34 and a criminal history category of III, which yields a Sentencing Guidelines range of 188 to 235 months. His offense level was based on his conviction of conspiracy and the court's calculation that he was responsible for the sale of between 840 grams and 2.8 kilograms of cocaine base. Capers

argues that the district court made two errors. First, he contends that it miscalculated the quantity of cocaine base attributable to him as a member of the conspiracy. Second, he maintains that because he was a member of the conspiracy for only about four months, his sentence should not be longer than the 120-month sentence given to Clark, who was involved in the conspiracy for more time.

Although the jury convicted Capers of a crime involving only a named quantity of "at least 280 grams" of crack cocaine, the district court was required at sentencing to estimate the actual quantity of drugs attributable to him. *United States v. Booker*, 543 U.S. 220 (2005). The court may use trial testimony, testimony at sentencing, and other evidence to make the determination; we review the calculation for clear error. See, *e.g.*, *United States v. Bautista*, 532 F.3d 667, 674 (7th Cir. 2008).

The court held all four defendants responsible for the same quantity of cocaine base. The court was purposefully conservative, basing its calculation on one year of the three-year conspiracy. It estimated that the defendants sold approximately $30,000 worth of crack cocaine each week, in $500 bundles that contained at a minimum 2.5 grams of crack. This amounted to 150 grams of crack per week. Based on Capers's 16-week involvement in the conspiracy, the court attributed 2.4 kilograms of crack cocaine to him.

The Sentencing Guidelines commentary provides that a defendant is liable for all of the drugs being sold for which he is directly involved, as well as all other sales which are reasonably foreseeable and within the scope of the conspiracy. U.S.S.G. § 1B1.3(a)(1)(B) cmt. n.2 (2012). For Capers's sentence to stand, there must be sufficient evidence to support not only

the district court's finding of the quantity of drugs being sold by the whole operation every week, but also its assessment of Capers's role in the operation. Capers argues that the only direct evidence implicating him involves a maximum of approximately 8.5 grams of cocaine—the sum of the drugs involved in a controlled buy in which he participated and the drugs and cash later found on him at arrest. He urges that the evidence does not show that the extent of the sales operation was foreseeable to him.

The government tried to bolster the trial record with testimony at sentencing from Qubid Coleman, who pleaded guilty to his involvement in the conspiracy, to demonstrate Capers's role. But the court found that Qubid lacked credibility and declared that it would not rely on his account. Rather, the court chose to rely on Tatum's trial testimony about the quantity of drugs sold.

Tatum testified that he had not "necessarily conspired with" Capers and had not met him before to their arrest. According to the Presentence Investigation Report (PSR), Qubid Coleman, Tatum, Clark, and Capers were all "runners" in the conspiracy. They slept at customers' homes and sometimes cooked powder into crack cocaine and stored it with the customers as well. But Tatum and Capers were never "runners" at the same time: Capers filled the position Tatum left open. The PSR stated that "[a] role reduction [for Capers] is not warranted because the defendant was an essential part of the distribution network and had complete knowledge of the scope of the conspiracy."

At sentencing, the district court judge resolved the quantity issue with these comments:

> I think that there's a few different theories to ar-
> gue why the full weight of the conspiracy would
> be appropriate to attribute to Mr. Capers, but I
> don't think it's necessary. I still think he's appro-
> priately at a level 34 because if you take 150
> grams per week times 16 weeks, that's 2.4 kilos
> which falls squarely within offense level of 34.
> So, based on that, the Court takes the proba-
> tion's position … and the appropriate level is 34.

The court declined to attribute the whole length of the con-
spiracy to Capers, but it did attribute the full drug amounts
involved during the 16 weeks of his involvement.

The court otherwise adopted the PSR, but neither the court
nor the PSR identified a specific evidentiary basis for attrib-
uting the whole scope of the conspiracy to Capers. Nonethe-
less, there is sufficient evidence in the record to conclude that
Capers was aware of the scope of the conspiracy, and the dis-
trict court did not commit clear error by adopting the PSR's
conclusion to that effect. Tatum testified at trial that he and
"Money" (Qubid Coleman) sold about $10,000 of crack co-
caine per day at the height of his involvement in the conspir-
acy. Tatum received drugs directly from the leaders—"Black"
(Frederick Coleman) and "Jake" (Jerry Brown)—or picked
them up from a stash house. Frederick Coleman and Brown
would put customers in touch with Tatum and Qubid Cole-
man through Tatum's personal cell phone or through a sepa-
rate phone that was just for the drug sales. It was reasonable
for the district court to adopt the PSR's finding that Capers
was a participant and that Capers's involvement resembled
Tatum's; this in turn supports the finding that Capers was
aware of the full scope of the conspiracy.

Capers also contends that his sentence is unreasonably long as a substantive matter, because it exceeds the term that Clark received. A sentencing court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Some sentencing disparities are reasonable, and others are not. *United States v. Meza*, 127 F.3d 545, 549 (7th Cir. 1996). Disparities between co-defendants that result from use of the Guidelines are reasonable. *Id*. An unreasonable disparity is "a disparity in sentences that cannot be explained by a comparison of each defendant against the Guidelines as a set of rules." *Id.* at 550.

The district court found Capers and Clark responsible for the same quantity of crack cocaine: between 840 grams and 2.4 kilograms. Clark's sentence was lower because his criminal history score was lower and he was eligible for U.S.S.G. § 5C1.2(a)'s "safety-valve" provision. The court also found that Clark was involved in the conspiracy "to a lesser degree" than Capers. A sentence "within a properly ascertained range … cannot be treated as unreasonable by reference to 3553(a)(6)." *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006). Because the district court did not commit clear error in calculating the drug quantity attributable to Capers, and the resulting Guidelines range differed for Capers and Clark because of the other factors, we reject Capers's argument that his sentence was unreasonably long.

## IV

We AFFIRM the judgments of the district court in each defendant's case.