RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0276p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 18-1671

TRACEY SMITH-KILPATRICK,

*Defendant-Appellant*.

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 2:17-cr-00005—Gordon J. Quist, District Judge.

Argued: October 22, 2019

Decided and Filed: November 7, 2019

Before: GUY, BUSH, and MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Scott Graham, SCOTT GRAHAM PLLC, Portage, Michigan, for Appellant  Tonya Long, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Scott Graham, SCOTT GRAHAM PLLC, Portage, Michigan, for Appellant  Tonya Long, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

───────────────

## OPINION

───────────────

RALPH B. GUY, JR., Circuit Judge.  A jury convicted defendant Tracey Smith-Kilpatrick of conspiring to distribute cocaine and heroin.  She was sentenced to 96 months of imprisonment.  She now appeals, raising three arguments: (1) the trial court made evidentiary

errors, (2) no rational jury could have convicted her based on the evidence, and (3) her sentence was procedurally and substantively unreasonable.  We affirm.

## I.  BACKGROUND

James Wilson lived in southeast Michigan, but he wanted to sell heroin in the state's Upper Peninsula.  So in 2014 he started recruiting a team near Escanaba and soon taught a handful of confederates how to package, transport, price, and sell the drug.  The conspirators grew in number and the operation settled into a routine.  Wilson stayed in the Lower Peninsula and sourced the drugs while others drove down, picked up the drugs, and drove them back to the Upper Peninsula.  Members of the operation then sold the drugs throughout the Upper Peninsula and wired money back to Wilson.  When the amount of money became too suspicious for wire transfers, the drug runners started carrying cash on their resupply trips to Wilson.

Over time, the conspiracy began to distribute crack cocaine as well, and to a wider geographic area, but the general mechanics of the conspiracy remained the same.  One constant was the way the drugs were transported.  To avoid detection in the event of a run-in with police, one or two women would travel as passengers to pick up the drugs from Wilson.  The women would conceal the drugs in their vaginal cavities until arriving back in the Upper Peninsula.  The drugs were then removed and sold.

Eventually the state police caught on.  A member of the conspiracy went to the police with information and they set up controlled buys that confirmed the trafficking of drugs.  Subsequent police raids turned up heroin and crack cocaine, cash, a drug ledger, cell phones, and MoneyGram receipts that listed who sent and received money.

The information found on the phones proved valuable.  The police extracted the phones' call logs and contact lists.  They then obtained call records and subscriber information from the phone companies via subpoena.  The phone records revealed a network of coconspirators cooperating between the Upper and Lower Peninsulas.

Smith-Kilpatrick was indicted along with Wilson, his mother Jacklyn, Rachel DeBruler, and Brandy Rupright. Wilson and Rupright pleaded guilty, but Smith-Kilpatrick, DeBruler, and Jacklyn Wilson went to trial. All three were convicted. Smith-Kilpatrick now appeals.

## II. DISCUSSION

### A. The Records

Prior to trial, the government moved to admit several types of documents: records of phone calls and wire transfers, hotel records, and car rental documents. In doing so, the government relied on the hearsay exception for records of a regularly conducted activity. *See* Fed. R. Evid. 803(6). And it contended that the records were self-authenticating because each record was accompanied by an affidavit from its custodian. *See* Fed. R. Evid. 902(11).

The records varied, but a salient feature of each was that it identified one or more people by name. For instance, a wire-transfer record revealed that a man named Isaac Cooley sent "Tracey Smith-Kilpatrick" money on January 12, 2015. And a record from a car rental company reported that "Tracey Kilpatrick" rented a particular GMC Terrain on September 30, 2015.

Smith-Kilpatrick objected to the records entering into evidence on the ground that their admission would violate her rights under the Confrontation Clause of the Sixth Amendment. She conceded that the documents were indeed business records that qualified for a hearsay exception under Rule 803(6). But she asserted that because the records implicated her by name, they suggested that it was actually she who conducted the transaction. In her view, this made them testimonial. She conceded that the records could come into evidence, but their testimonial nature meant that they could not be self-authenticated through affidavits. Rather, a cross-examinable witness was required; one who could testify that it was indeed Smith-Kilpatrick who, for instance, received the money or rented the car and not merely someone using her name.

The district court rejected her argument. It reasoned that the records were not prepared in anticipation of prosecution and were non-testimonial, so they did not run afoul of the Confrontation Clause. In the court's view, Smith-Kilpatrick's argument that another person

might have used her name went to the weight of the evidence, not its constitutionality or admissibility.  The court therefore admitted the exhibits into evidence.

Smith-Kilpatrick asserts this was error, claiming both a violation of the Confrontation Clause and errors under the Federal Rules of Evidence.  We review the Confrontation Clause challenge de novo and the evidentiary rulings for abuse of discretion.  *United States v. Warman*, 578 F.3d 320, 345 (6th Cir. 2009).

## 1.  Constitutionality

The Sixth Amendment guarantees that "the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]"  U.S. Const. amend. VI.  The Supreme Court identified the contours of this guarantee in *Crawford v. Washington* and held that prior testimonial evidence was inadmissible against a criminal defendant unless the witness was unavailable and the defendant had a prior opportunity for cross examination.  541 U.S. 36, 68 (2004).  The Court's *Crawford* opinion also gave some guidance for defining "testimonial evidence."  It observed that "testimony"—as that term was used when the Sixth Amendment was ratified—is "typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact."  *Id.* at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)) (alteration adopted).  Thus, for instance, the affidavits of laboratory analysts in subsequent cases were deemed testimonial, requiring the analyst to appear at trial and attest to the truth of the statements in the lab reports.  *See Bullcoming v. New Mexico*, 564 U.S. 647 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009).

Although *Crawford* did not involve records of a regularly conducted activity, the Court remarked that "business records" covered by the traditional hearsay exception are "by their nature" not testimonial.  541 U.S. at 56.  *See also Michigan v. Bryant*, 562 U.S. 344, 392 (2011) (Scalia, J., dissenting) (quoting *Melendez–Diaz*, 557 U.S. at 324) (noting that the Sixth Amendment generally admits business records into evidence "not because the records are reliable or because hearsay law says so" but "'because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not' weaker substitutes for live testimony.").  Other courts have reached this

issue more directly and held that the same types of business records at issue in this case are not testimonial and thus do not implicate the Confrontation Clause. *See, e.g.*, *United States v. Brown*, 822 F.3d 966, 974 (7th Cir. 2016) (holding that Western Union and MoneyGram records were not testimonial because they "were routine and prepared in the ordinary course of business, not in anticipation of prosecution"); *United States v. Yeley-Davis*, 632 F.3d 673, 679 (10th Cir. 2011) (holding that cell phone records were not testimonial because they were created for the administration of the phone company's affairs "and not for the purpose of establishing or proving some fact at trial").

We reach the same conclusion here. The contested records in this case were company documentations of wire transfers, phone calls, car rentals, and hotel stays. No one disputes that Smith-Kilpatrick's name was entered into these records as part of the ordinary course of creating them for business purposes. And no one suggests that the creators of the records thought that, by entering her name, they were making solemn declarations or that their identifications would likely be used to accuse a criminal defendant. A reasonable person observing the records' creation would not have thought so either. These are the hallmarks of testimonial evidence and they are missing. *Compare Williams v. Illinois*, 567 U.S. 50, 84 (2012) (Alito, J., plurality opinion) *with id.* at 104 (Thomas, J., concurring) *and id.* at 121 (Kagan, J., dissenting). *See also United States v. Collins*, 799 F.3d 554, 586 (6th Cir. 2015) ("[I]t is improbable that a pharmacy employee running a standard identification check of a customer would have anticipated that the records of that transaction would later be used against these particular defendants at trial."). The records were not testimonial and thus did not implicate the Confrontation Clause.

The admission of the summaries of those records did not violate the Confrontation Clause either. Some of the records were voluminous, so the court admitted summaries of them pursuant to Rule 1006. Such summaries can "theoretically be the subject of a Confrontation Clause challenge in a case where the individual who prepared the chart was not available for cross-examination." *United States v. Williams*, 662 F. App'x 366, 376 n.6 (6th Cir. 2016). But here, the person who prepared each summary testified at trial and was cross-examined. Thus, even if the summaries qualified as testimonial, the court did not violate the Confrontation Clause by admitting them.

## 2.  Admissibility

Constitutionality does not guarantee admissibility.  Smith-Kilpatrick argues that even if the records did not run afoul of the Sixth Amendment, they still should not have come into evidence. Her reasoning is essentially the same: there were inadequate assurances that the person who rented the cars, received the money, and so forth was in fact Smith-Kilpatrick and not an imposter.  Accordingly, Smith-Kilpatrick contends that the records and summaries were irrelevant, not self-authenticating, and inadmissible hearsay.

## A.  Relevance

Under the Federal Rules of Evidence, an item of evidence is admissible only if it is relevant, i.e., only if it tends to make a consequential fact more or less probable than it would be without the evidence.  Fed. R. Evid. 401, 402.  Absent some other infirmity, all of these records pass that test.  The government had to prove, among other things, that there was indeed a conspiracy. *See United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005).  Witnesses testified there was a conspiracy and explained how it involved renting cars, using hotel rooms, wiring money, and corresponding with cell phones.  The records confirmed that these activities occurred and added detail.  The records would therefore be relevant on that basis alone.  But the inclusion of Smith-Kilpatrick's name in the records also made them relevant to prove her involvement because they made it more probable that she participated in these activities.  Smith-Kilpatrick was of course free to argue that someone else might have used her name while conducting each of those transactions.  But that argument goes to the weight of the evidence, not its admissibility. *See United States v. Causey*, 834 F.2d 1277, 1286 (6th Cir. 1987).  The district court did not abuse its discretion in deeming the records relevant.

## B.  Self-Authenticating

The Rules also require authentication: a proponent who wishes to enter an item into evidence "must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  Some forms of evidence can be self-authenticating and Rule 902(11) is the applicable self-authentication rule in this case.  Under it, a record is self-authenticating if it is a copy of a "domestic record that meets the requirements of

Rule 803(6)(A)–(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court."  Fed. R. Evid. 902(11).  The only other requirement is that "[b]efore the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record—and must make the record and certification available for inspection—so that the party has a fair opportunity to challenge them."  *Id.*

Smith-Kilpatrick does not suggest that she was not given this opportunity, nor does she attack the custodians' certificates, so we turn our attention to the three requirements borrowed from Rule 803(6):

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;

Fed. R. Evid. 803(6).  The disputed records all satisfy these requirements and, in fact, neither party truly suggests otherwise.  No one disputes, for instance, that an Avis employee created a record on September 30, 2015, memorializing that the company lent out a GMC Terrain.  Nor does anyone dispute that Avis makes and keeps this kind of record in the regular course of its business.  Smith-Kilpatrick claims the person who rented the car may have been an imposter, but even if that were so, the deceived Avis employee would still be a person "with knowledge" of the transaction.  The transaction would just misrepresent who in fact drove off in the rented car.

The accuracy of a record is of course important.  But that is why Rule 803(6) provides an additional requirement to exempt a record from the rule against hearsay.  A record of a regularly conducted activity is not exempted from the rule against hearsay—and thus inadmissible—if the opponent shows "that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."  Fed. R. Evid. 803(6)(E).  This is the safeguard against imposters, not subsection (A)'s requirement that the record creator be "someone with knowledge."  Fed. R. Evid. 803(6)(A).

For this reason, Smith-Kilpatrick's imposter theory is misplaced in challenging the records' ability to self-authenticate. Rule 902(11) does not require Rule 803(6)(E) to be satisfied; just (A)–(C). Thus, even if an imposter impersonated Smith-Kilpatrick when renting cars, receiving money, staying in hotels, and conducting phone calls, the records of those transactions would be no less authentic. This makes sense, because self-authentication is not concerned with the accuracy of a record, but rather, providing a streamlined method of ensuring that a document is indeed what its proponent claims it is. *See* Fed. R. Evid. 901(a). The government claimed these were records of transactions involving someone who gave the name Tracey Smith-Kilpatrick—which is precisely what they are, imposter or not. The district court properly deemed the records self-authenticating.

## C. Hearsay

We next consider whether the records were hearsay, which does implicate their accuracy. Hearsay is inadmissible, absent an exception. Fed. R. Evid. 802. As already noted, Rule 803(6)(E) exempts records from the hearsay bar only if "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(E). The opponent's showing of untrustworthiness must be specific and credible. *United States v. Hathaway*, 798 F.2d 902, 907 (6th Cir. 1986). Short of that, and assuming a proper foundation has been laid, "the proper approach is to admit the evidence and permit the jury to determine the weight to be given the records." *Id.* We therefore turn our attention to how each of these records came into evidence.

### *Hotel Records*

Early in the trial, Alisha St. Vincent testified for the government. She explained how she transported drugs for the conspiracy in the early part of 2015 and mentioned meeting Smith-Kilpatrick at the Super 8 motel in St. Ignace, Michigan. Later in the trial, the government called Sergeant Ronald Koski to the stand and drew his attention to a billing record from that same motel. Koski confirmed that it had been obtained via subpoena and the government successfully moved for its admission. The record listed the registered guest as Smith-Kilpatrick and the

guest's address was in West Bloomfield—the same address where Koski had seen Smith-Kilpatrick.

Neither the direct nor cross examination of these witnesses gave reason to doubt the trustworthiness of the preparation of the hotel records. True, Smith-Kilpatrick drew out details that might have supported her theory that someone else used her name to register at the hotel. For instance, Wilson lived with Smith-Kilpatrick at the West Bloomfield address and Brandy Rupright had been there before, so both of them would have known the address and could have provided it to the hotel. And there were discrepancies in St. Vincent's recollection of the order of events involving Smith-Kilpatrick's alleged stay at the hotel. But this testimony did nothing to shake the trustworthiness of the hotel records themselves. It was not an abuse of discretion to admit them.

*Wire Transfers*

During trial, a government witness, Isaac Cooley, testified that he sent money via wire transfers as part of the conspiracy. This led the government to show him a summary of wire transfer records. After looking at the exhibit, Cooley confirmed he wired money to Smith-Kilpatrick on a particular date.

Later in the trial, the government called to the stand James Lewandowski, an employee at the Walmart in Marquette, Michigan, where the conspiracy partially took place. On direct examination, Lewandowski confirmed that he was knowledgeable about Walmart's wire-transfer protocols and testified that Walmart requires senders and receivers to show photo identification. The court later admitted the records and summaries of the transfers into evidence.

On cross examination, Smith-Kilpatrick's attorney asked him about video surveillance that would have recorded the people conducting a wire transfer. Lewandowski confirmed that any transaction would have been captured on video. In closing arguments, Smith-Kilpatrick pointed out that the government could have obtained the surveillance videos to prove its case, but it failed to do so.

Smith-Kilpatrick sowed seeds of doubt, but not so many that the wire-transfer records could not come into evidence. The government laid a foundation, which left Smith-Kilpatrick to show specific and credible evidence that the records were untrustworthy. *See Hathaway*, 798 F.2d at 907. The lack of surveillance footage gave the jury an opportunity to doubt the transactor's true identity, but it did nothing to impugn the records themselves. It was not an abuse of discretion to admit them.

*Car Rentals*

Brandy Rupright testified to personally renting cars with Smith-Kilpatrick on two occasions and explained that the two of them had to show their driver's licenses to receive the vehicles. When Koski took the stand, he explained that he had obtained records from the car rental company via subpoena. The government then successfully moved for the admission of the records.

Smith-Kilpatrick cross-examined both Rupright and Koski, but in neither instance did she address the car rentals, much less the reliability of the records. Consequently, her imposter theory does nothing to render these business records inadmissible. Rupright's testimony confirmed that identification was required to rent the cars and Smith-Kilpatrick failed to show specific and credible reasons that the car rental records were untrustworthy. *Cf. Hathaway*, 798 F.2d at 907. It was not an abuse of discretion to admit them.

*Phone Records*

The phone records and their summaries also came in through Koski's testimony. Koski explained how the police obtained the phone records and he explained how he turned those records into summaries. As he gave his explanations, the government moved for the admission of the records and the summaries. One exhibit was the record of calls made to and from a phone number ending in 4447. The government asked Koski if he was able to identity whom the number belonged to. Koski answered that the subscriber to that number was "Charles Wheeler," a "known alias of James Wilson." But he explained that the number was used by both James Wilson and Smith-Kilpatrick.

As these exhibits came into evidence, Smith-Kilpatrick reiterated her standing objection based on the Confrontation Clause. And on cross examination, she pursued the idea that it may have been Wilson, and not Smith-Kilpatrick, who used the phone. But she never challenged the trustworthiness of the phone records themselves. Nor did she challenge the trustworthiness of the summaries. It was not an abuse of discretion to admit them.

## B.  The Co-Conspirator Statements

The government moved to admit several out-of-court statements made by people who did not testify at trial. Smith-Kilpatrick objected on the grounds that the statements were hearsay, but the district court admitted them into evidence because it found they were made by coconspirators and thus not hearsay. *See* Fed. R. Evid. 801(d)(2)(E). Smith-Kilpatrick asserts this was error.

A statement is not hearsay if it is offered against an opposing party and "was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To introduce such statements as evidence, the government bears the burden of showing three things by a preponderance of the evidence: (1) a conspiracy existed, (2) the defendant was a member of the conspiracy, and (3) the statement was made in the course and furtherance of the conspiracy. *United States v. Martinez*, 430 F.3d 317, 325 (6th Cir. 2005). The district court must then make findings on each of these. *Id.* We review those factual findings for clear error, and we review the decision to admit such statements for abuse of discretion. *Id.* at 326.

Smith-Kilpatrick argues that the government failed to show that she was a coconspirator. Her argument is essentially threefold. First, the evidence against her came from self-interested drug addicts who stood to benefit from lightened sentences, so it counted for little. Second, there was inadequate proof that she was actually the person who received the wire transfers and rented the cars (an argument akin to the claims we have already discussed). And third, the phone calls attributed to her might easily have been made by Wilson; the two shared a phone and, by all accounts, he was at the center of the conspiracy.

Her arguments fail because there was ample evidence for the district court to find that Smith-Kilpatrick was a coconspirator. Isaac Cooley testified to conversing with Smith-

Kilpatrick about sourcing crack cocaine and about how, at Smith-Kilpatrick's prodding, he demonstrated to her that he could properly package heroin. He also testified that Smith-Kilpatrick personally transported drugs on one occasion. Brandy Rupright testified that she and Smith-Kilpatrick packaged crack cocaine and heroin. And Alisha St. Vincent testified to a meeting in a motel room during which Smith-Kilpatrick handed her a condom filled with heroin so that St. Vincent could transport it.

The district court was free to disbelieve this testimony, but it was not clearly erroneous to believe it. Nor would it have been clearly erroneous to conclude that Smith-Kilpatrick truly received the wire transfers, rented the cars, and made the phone calls. The district court did not clearly err in finding that Smith-Kilpatrick was a co-conspirator for the purposes of Rule 801, so the admission of the statements was not an abuse of discretion.

## C. Sufficiency of the Evidence

Through a special verdict form, the jury found Smith-Kilpatrick guilty of conspiring to possess with the intention to distribute fewer than 100 grams of heroin and 28 grams or more of cocaine base. Smith-Kilpatrick claims there was not enough evidence to support this finding beyond a reasonable doubt. We review sufficiency-of-the-evidence claims in the light most favorable to the prosecution and ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Martinez*, 430 F.3d at 330 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The government had to prove three things: (1) there was an agreement to violate 21 U.S.C. § 841(a)(1); (2) Smith-Kilpatrick knew of the conspiracy and intended to join it; and (3) she participated in the conspiracy. *Id.* On appeal, Smith-Kilpatrick does not dispute that there was a conspiracy or that she knew about it. She simply insists that there was not enough evidence to prove that she was a part of it or even intended to get involved. Her arguments in support of this claim are mostly an amalgam of what we have already discussed: the money transfers and phone calls may have been conducted by someone else and the witnesses who testified to her involvement were "self-interested cooperating drug abusers[.]" She adds that many members of the conspiracy admitted that they did not know her and had never met her.

These arguments fail.  To begin, a defendant need not know every member of the conspiracy, the acts of other members, or even the full extent of the conspiracy to be held responsible for the acts of other members.  *See United States v. Carr*, 5 F.3d 986, 990 (6th Cir. 1993).  The obverse is equally true: a defendant may be found guilty of participating in a conspiracy, even if some of the other members did not know she was a part of the enterprise.  And "once the existence a conspiracy is shown, the evidence linking an individual defendant to that conspiracy need only be slight."  *United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006).  Here, there was voluminous evidence explaining the scope and nature of the conspiracy and several witnesses testified to Smith-Kilpatrick's direct involvement in packaging, transporting, and financing the sale of drugs—activities at the heart of the conspiracy.

Her remaining arguments about witness reliability and the possibility that someone else took actions in her name are no reason to set aside the jury's verdict.  "The government may meet its burden through circumstantial evidence alone, and such evidence need not exclude every possible hypothesis except that of guilt."  *United States v. Jackson*, 55 F.3d 1219, 1225 (6th Cir. 1995).  The government introduced testimony and records directly implicating Smith-Kilpatrick in the transactions undergirding the conspiracy: wire transfers, car rentals, drug transports, and phone calls between the various conspirators.  She proposed alternative explanations, but the jury believed the government.  The evidence supports that finding and we may not reweigh it "or substitute our judgment for that of the jury."  *Martinez*, 430 F.3d at 330.

### D.  Sentencing

Smith-Kilpatrick's final argument attacks the 96-month sentence she received.  First, she asserts that the drug quantity that the district court attributed to her was too high, thus resulting in a procedurally unreasonable sentence.  And second, she asserts that her sentence is substantively unreasonable because it fails to adequately account for her particular circumstances.  When reviewing a sentence, we look for abuse of discretion.  *Gall v. United States*, 552 U.S. 38, 51 (2007).  A sentencing court's determination of drug quantity is specifically reviewed for clear error, and when a sentence falls below the applicable Guidelines range, we presume it is substantively reasonable.  *United States v. Pirosko*, 787 F.3d 358, 374 (6th Cir. 2015); *United States v. Treadway*, 328 F.3d 878, 883 (6th Cir. 2003).

### 1.  Procedurally Unreasonable

The probation office concluded in its presentence report that the conspiracy distributed a total of 694.75 grams of heroin and 127.75 grams of cocaine base.  Together, these amounted to 1,150.95 kilograms of marijuana equivalent.  *See* USSG § 2D1.1, cmt. n.8(D) (2016).  The presentence report recommended that Smith-Kilpatrick "be held accountable for the entire drug weight involved in the conspiracy" because she "conspired with [James] Wilson to organize the distribution of both heroin and cocaine base" and "shared the residence with [him] that was maintained as a premise for packaging and distributing drugs."  The report therefore suggested a base offense level of 30.  *See id.* § 2D1.1(c)(5).

Smith-Kilpatrick objected.  She maintained that she should not be held responsible for the heroin because, according to witness testimony, the conspiracy had different people in charge of the two substances.  She averred that the government failed to prove her involvement in the heroin side of the operation, and thus she should be held responsible only for the cocaine.  By that measure, her base offense level would have been 26, not 30.  *See id.* § 2D1.1(c)(7).

The court overruled her objection at sentencing.  The sentencing judge had presided over the trial and observed that, based on the trial testimony, Smith-Kilpatrick "always seems to be there. . . . [S]he's involved in all aspects of this.  I mean she was involved in the money aspect, she was involved in the transportation aspect, she was involved with the packaging aspect[.]"  In the court's view, "to say that she didn't know that she was trafficking in heroin just doesn't fit with any of the facts in the case.  I mean she's there.  She's living with [Wilson], for crying out loud, that's doing all this."  The court recognized the testimony suggesting that Wilson handled the heroin while Smith-Kilpatrick handled the cocaine but dismissed this as "just talk."  And the court emphasized that Smith-Kilpatrick was being held responsible for a "conservative" estimate of the drug quantities involved.

The district court's finding was not clear error.  To begin, a coconspirator's testimony "may be sufficient to determine the amount of drugs for which another coconspirator should be held accountable."  *United States v. White*, 563 F.3d 184, 196 (6th Cir. 2009).  This is so even if a different trier of fact might not have found the witness credible.  *See United States v. Darwich*,

337 F.3d 645, 663 (6th Cir. 2003) ("If the district court interprets the evidence in a manner consistent with the record, we are required to uphold its decision even if we would have reached the opposite conclusion."). And the district court could reasonably believe some of a witness's statements while disbelieving or discounting others. The sentencing judge personally observed the witnesses at trial. He could reasonably find their statements about the transactions believable while concluding that the testimony about who handled what substance was "just talk."

Whether believed or disbelieved, witness testimony sufficiently supported the decision to attribute the heroin to Smith-Kilpatrick. It is undisputed that Smith-Kilpatrick was romantically involved with Wilson, the head of the conspiracy, and that the heroin was packaged in their shared home. Even if the two of them generally focused on different drugs, multiple witnesses testified to Smith-Kilpatrick's direct involvement with the heroin side of the business. According to Isaac Cooley, Smith-Kilpatrick did not charge him transportation fees for the heroin he received because he agreed to turn over all his crack-cocaine proceeds to her. Cooley also recalled Smith-Kilpatrick's presence at a heroin sale and testified that Smith-Kilpatrick personally transported heroin within her body at least once. Alisha St. Vincent recalled Smith-Kilpatrick handing her heroin for transportation and Brandy Rupright remembered preparing drugs at Smith-Kilpatrick's home prior to transporting them. According to Rupright, she and Smith-Kilpatrick packaged the cocaine while Wilson packaged the heroin—but they did it together. And even so, the drugs would sometimes be placed in a single condom for transportation. In the face of this and other testimony, Smith-Kilpatrick faces an uphill climb in claiming, as she does in her brief, that she "could not have foreseen the extent of Mr. Wilson's dealings[.]"

Admittedly, a different sentencing judge could have reasonably held Smith-Kilpatrick responsible for a lesser amount of the heroin—perhaps even none at all. But our review is for clear error, so we may disturb the sentence only if we are "left with the definite and firm conviction that a mistake has been committed." *Darwich*, 337 F.3d at 663. We find no such mistake and thus conclude that it was not clear error for the district court to hold Smith-Kilpatrick responsible for the entire amount of heroin.

2. Substantively Unreasonable

The presentence report's calculations resulted in a Guidelines range of 188–235 months of imprisonment. But the report suggested a lower sentence of 120 months, citing the statutory requirement that a sentence be "sufficient but not greater than necessary." 18 U.S.C. § 3553(a). At sentencing, the district court chose not to adopt all of the report's suggestions and thus Smith-Kilpatrick faced a lower Guidelines range of 121–151 months of imprisonment. That range placed Smith-Kilpatrick on par with the already-sentenced Wilson, whom the court considered more culpable overall. So the court varied downward by about twenty percent of the low-end of the range and sentenced her to 96 months of imprisonment.

On appeal, Smith-Kilpatrick argues that the variance should have plunged further downward. She claims that the Guidelines—and by extension, her below-Guidelines sentence— are simply unjust in this case, given her role in the conspiracy and public sentiment about lengthy sentences. Even if we were to agree with these claims, they would not render her sentence substantively unreasonable.

Our review is limited. We look only for abuse of discretion and we presume a below-Guidelines sentence is reasonable. *Gall*, 552 U.S. at 51; *Pirosko*, 787 F.3d at 374. We take this deferential approach because the "sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case." *Gall*, 552 U.S. at 51.

> The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record. The sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the [Sentencing] Commission or the appeals court. Moreover, district courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines cases than appellate courts do.

*Id.* at 51–52 (internal citations and quotation marks omitted, alterations adopted).

Smith-Kilpatrick does not contend that the district court failed to consider the factors prescribed by § 3553. And the district court explicitly considered what Smith-Kilpatrick principally presses on appeal: her comparative role in the conspiracy. That was the very reason she received a downward variance. Once again, a different judge might have reasonably varied

further downward, or not at all.  But the judge in this case chose to vary downward by about twenty percent.  He did not abuse his discretion by going no further.

\* \* \*

The judgment of the district court is AFFIRMED.