In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1791

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT J. LUNN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 CR 00402 — **Charles R. Norgle**, *Judge.*

ARGUED FEBRUARY 15, 2017 — DECIDED JUNE 20, 2017

Before BAUER, EASTERBROOK, and HAMILTON, *Circuit Judges.*

BAUER, *Circuit Judge.* On May 30, 2012, Defendant-appellant Robert Lunn was charged with five counts of bank fraud, in violation of 18 U.S.C. § 1344. A jury convicted Lunn on all five counts on October 17, 2014. Lunn now challenges his conviction, arguing that the district court improperly interfered with

his testimony and failed to provide his requested jury instruction.

## I. BACKGROUND

Lunn owned and operated Lunn Partners, L.L.C., an investment advisory firm in Chicago, Illinois, that advised mostly high-net worth clients. In 1999, Lunn invested in Leaders Bank, a small commercial bank in Oak Brook, Illinois. The charges in this case stem from Lunn's conduct surrounding three extensions of credit by Leaders Bank: a line of credit he obtained for himself; a loan that Lunn arranged for former Chicago Bulls player Scottie Pippen; and a loan that Lunn arranged for Robert Geras, a Lunn Partners client.

### A.  Personal Line of Credit

In May 2001, Lunn contacted James Lynch, CEO of Leaders Bank, seeking to obtain a $480,000 line of credit. Lunn provided the bank with a December 31, 2000, personal financial statement attesting that he owned shares of Morgan Stanley common stock with a market value of $11.5 million. The statement further attested that he owned shares of Lehman Brothers common stock with a market value of $5.5 million. Based on Lunn's purported ownership of a combined $15 million worth of common stocks, the bank provided Lunn the line of credit. However, the fact was that Lunn no longer owned the stocks; he had sold them in the 1990s to fund the launch of Lunn Partners. His brokerage account statements did not include the stocks, nor did his tax returns report any dividends earned from the stocks.

In January 2004, Lunn sought to increase his line of credit by $720,000, bringing the total line of credit to $1.2 million.

Lunn submitted a personal financial statement dated December 31, 2003, in support of his request. The statement falsely stated that Lunn still owned both the Morgan Stanley and Lehman Brothers stock, but that the market value for the stocks had fallen to $5.8 million and $1 million, respectively, for a total of $6.8 million. Lunn's purported ownership of the stock persuaded Leaders Bank to increase Lunn's credit line.

In April 2004, Lunn sought a $120,000 increase in his credit line. Based upon Lunn's purported ownership of $6.8 million in common stock from Morgan Stanley and Lehman Brothers, bank officials granted Lunn's request; Lunn's total credit line was then $1.32 million.

## B. Pippen Loan

In September 2002, Lunn contacted Leaders Bank to arrange for a short-term loan of $1.4 million. The terms of the loan required that principal and interest be paid back in 45 days. Lunn told the bank that Pippen sought the loan to purchase an interest in an airplane, but Lunn used the proceeds of the loan to repay one of his clients, Robert Shaw.

Lunn sent Pippen the signature page from the agreement. Pippen signed the document in the belief that it involved transferring his assets from his previous investor to Lunn. Lunn failed to repay the loan within 45 days, but asked the bank to extend the loan four times. Each time, Lunn forged Pippen's name on the loan extension documents. The loan was ultimately extended through January 2005. In the interim, Pippen lost confidence in Lunn's financial management abilities and fired him in late 2003.

### C.  Geras Loan

Lunn approached Geras to invest in a real estate venture in May and June 2004; Geras declined. Nonetheless, Lunn forged Geras' name on loan documents to obtain a $500,000 loan from Leaders Bank. Lunn told bank officials that Geras needed the loan to fund the development of a shopping center on Chicago's south side. In July 2004, Geras received a notice from Leaders Bank seeking interest on the loan. Geras contacted Lunn to inquire about the loan but did not receive an answer. Geras received another notice the next month, and this time he contacted the bank directly, which informed him that Lunn had obtained a loan on his behalf. Lunn and Geras met in September 2004; Lunn attempted to account for the loan with far-fetched explanations, and eventually told Geras that the bank had made a mistake. Lunn promised Geras that he would correct the bank's mistake. He sent Geras an email that stated:

> geras … I have my tit in the ringer on this bank stuff. … [W]hen u are comforted that the matter is clear by hearing that the loan is paid, you can say that lunn told me I was in, then he told me I was not in, so how could I have a loan? sorry to put you in this position … . Please talk to me before anyone else.

At trial, Lunn testified that with respect to his personal line of credit, he did not intend to deceive bank officials about his net worth. He stated that in May 2001 he had assets worth nearly $20 million and liabilities around $1 million. He admitted to preparing the December 2000 financial statement

and claimed that it accurately conveyed his net worth. Lunn testified that he did not prepare the December 2003 financial statement and had no knowledge of how the bank received it.

As to the Pippen loan, Lunn testified that he told Lynch the purpose of the loan was to finance the development of the shopping center, not an airplane. Lunn stated that Pippen's investment would serve as a substitute for half of the initial investment made by Shaw. Lunn also testified that he believed he was authorized by Pippen to sign the loan extension documents for him; Pippen contradicted this statement. Lunn stated that he notified bank officials that he signed Pippen's name to the loan extension documents at the time of their submission. As to the Geras loan, Lunn testified that Geras agreed to make an investment in the real estate development and authorized Lunn to sign his name to the loan documents; Geras testified that Lunn took out the loan without his knowledge or consent.

The jury convicted Lunn on all counts; Lunn filed a motion for judgment of acquittal or a new trial. The court denied the motion, and sentenced him to 36 months' imprisonment. Lunn timely appealed.

## II. DISCUSSION

Lunn mounts two attacks on his conviction. He argues first that the district court improperly "interfered" with his testimony, preventing him from presenting his theory of defense. Next, he argues that the court erred by refusing to give the jury the good-faith instruction that he tendered to the court. We address each argument in turn.

## A. Testimonial Interference

We review a district court's evidentiary rulings for abuse of discretion. *United States v. Brown*, 822 F.3d 966, 971 (7th Cir. 2016) (citation omitted).

Lunn contends that the court's multiple intrusions into his testimony were so serious that he did not receive a fair trial; we review this *de novo*. *Id.* Lunn contends that the court interfered with his testimony about the Pippen loan. Specifically, he argues that the court interfered with his testimony about the purpose of the loan. He contends that the court erred by precluding him from presenting to the jury or testifying about a separate loan and agreement from April 2002 that Pippen purportedly entered into in order to purchase an airplane. Part of Lunn's theory of defense was that the purpose of the September 2002 Pippen loan was not to finance the purchase of an airplane, but rather to buy Shaw out of half of his interest in a bridge loan to purchase a shopping center. Trial evidence demonstrated that Lunn wire transferred the proceeds of the loan to Shaw. Lunn's testimony about the Shaw investment was subject to a series of objections on grounds of hearsay and lack of foundation; the testimony referred to several out-of-court statements offered for the truth of the matter. Ultimately, after a sidebar, Lunn was able to offer testimony regarding the purpose of the loan. He was also able to deny Lynch's claim that he told the bank the purpose of the loan was to finance the purchase of an airplane. It is unclear what testimony Lunn claims the court prevented him from providing to the jury.

An additional element of Lunn's defense was that bank officials mistakenly conflated the purpose of the September 2002 loan with that of the April 2002 loan. Lunn's testimony about the April 2002 agreement was subject to an objection based on hearsay and lack of foundation. The court properly sustained both objections, as Lunn sought to testify about the existence of a contract not in evidence without establishing any personal knowledge of the contract. Lunn was unable to cure the deficiencies in his testimony, so the testimony was properly excluded. We note that the testimony about the April 2002 loan would have been largely irrelevant, as it did not address the salient issues—the reason Lunn provided for the purpose of the September 2002 loan and whether Pippen granted Lunn authority to sign the loan extension documents.

Lunn also argues that the court prevented his testimony about the shopping center development that prompted all of the loans. Lunn contends that this precluded the jury from having "important context." It is unclear what "context" Lunn believes the jury did not hear. The jury heard Lunn's testimony that the purpose of Pippen's September 2002 loan was to finance the shopping center. It also heard about Lunn's discussions with Pippen regarding the development and Lunn's transfer of Pippen's loan proceeds to Shaw. Lunn did not seek to provide further "context" about the development in his cross-examination of Shaw, who originally financed the development.

Next, Lunn contends that the court interfered with his testimony about "his own understanding of his net worth." Although Lunn admitted that the financial statements he provided to the bank in support of his personal line of credit

were inaccurate, he sought to prove a lack of intent by testifying that the statements accurately reflected his net worth. The government objected because Lunn's counsel failed to establish the basis of Lunn's claim of knowledge of his assets and liabilities. After a protracted exchange with the court, Lunn described his assets as of May 2001, identifying the name of the asset, the type of ownership, and the value. He did the same for his liabilities. Nevertheless, the fact of his net worth is not relevant; it does not negate the government's contention that Lunn obtained the line of credit by submitting fraudulent financial statements. *See* 18 U.S.C. § 1344.

Relatedly, Lunn argues that the court impeded his testimony regarding his assets as disclosed in his 2005 bankruptcy. Lunn contends that this testimony would have demonstrated that he lacked the intent to defraud the bank by revealing that all of his creditors had been repaid. When Lunn's counsel questioned him regarding the repayment of his creditors, the government objected on relevance grounds; the court sustained the objection. This was the proper course of action. Bank officials testified that Lunn's purported ownership of the Morgan Stanley and Lehman Brothers stock at the time of the credit line extension was important to their decision, and Lunn admitted that he did not own the stocks during the relevant time period. Neither his high net worth nor ability to repay his creditors is relevant to this issue. There was no undue interference by the court.

We briefly turn to Lunn's argument that he was denied a fair trial.

Lunn's reliance on *United States v. Busic*, 592 F.2d 13 (2d Cir. 1978) and *United States v. Kellington*, 217 F.3d 1084 (9th Cir. 2000) is misplaced. In *Busic*, the district court and the government interrupted closing argument for the defense numerous times, and the court provided personal commentary on the evidence. 592 F.2d at 27–29. Nevertheless, the Second Circuit upheld the defendants' convictions. *Id* at 35. Conversely, the district court did not interfere during Lunn's trial, rather it appropriately ruled on the government's objections and prevented the admission of inadmissible evidence and testimony. In *Kellington*, the district court improperly minimized the significance of the defense's expert witness in its jury instruction, which the Ninth Circuit found hampered the defendant's ability to present his theory of the defense in closing argument. 217 F.3d at 1100. However, as discussed above, Lunn largely succeeded in presenting the testimony he wished the jury to consider. Nor was he denied the right to present his theory of defense at any phase of the trial.

### B. Good-Faith Instruction

We review the denial of a requested jury instruction *de novo*. *United States v. Cruse*, 805 F.3d 795, 814 (7th Cir. 2015) (citation omitted). "Defendants are not automatically entitled to any particular theory-of-defense jury instruction." *Id*. (citation omitted).

> A defendant is only entitled to a jury instruction that encompasses a theory of the defense if (1) the instruction represents an accurate statement of the law; (2) the instruction reflects a theory that is supported by the evidence; (3) the

> instruction reflects a theory which is not already part of the charge; and (4) the failure to include the instruction would deny the defendant a fair trial.

*Id.* (citation and alteration omitted).

Lunn's proposed jury instruction stated that "[i]f the defendant acted in good faith, then he lacked the intent to defraud required to prove the offense of bank fraud[.]" It further stated that "[t]he defendant acted in good faith if, at the time, he honestly believed the accuracy of the personal financial statements and the validity of the signatures that the government has charged as being fraudulent." Lunn argues that the instruction was appropriate because his theory of defense is that he did not knowingly submit false personal financial statements to the bank, and he did not intend to deceive the bank by signing the Geras and Pippen loan applications.

The court instructed the jury that the government was required to prove, beyond a reasonable doubt, that Lunn "knowingly executed" a scheme to defraud "with the intent to defraud." The court further instructed that "[a] person acts with intent to defraud if he acts knowingly with the intent to deceive or cheat the victim … ." We have held that "an action taken in good faith is on the other side of an action taken knowingly[,]" and therefore, "it is impossible to intend to deceive while simultaneously acting in good faith." *United States v. Mutuc*, 349 F.3d 930, 936 (7th Cir. 2003) (citation omitted). As a result, Lunn's good-faith instruction would

have been at best redundant. The court properly denied the instruction.

## III. CONCLUSION

We AFFIRM Lunn's conviction.